Next case is Brunton v. Kruger for the appellant, Mr. Turner, and for the accolade, Mr. Dietsch. You may proceed. May it please the court and counsel. Good morning. It's our honor to be here today, and it is a beautiful day today. After going through the worst drought since 1936, a few rain clouds are a great thing. It's better than a sunny day today for the 4th District. I'd like to introduce, if I could, take a moment. This is Xu Kong Liu and Yuobi Gao. These young ladies are lawyers, licensed lawyers from China, and they both completed their second law degree at the University of Illinois. Xu Kong is a member now of the New York Bar, and soon Yuobi will be. And they are interns in the office, and they have worked on this similar to, I think, perhaps the way a law graduate may assist the court with some matters. Thank you. They've been to many courts, met several of our judges, and are fascinated by the similarities and some major differences in the laws of the two countries. I'd like to indicate I'm very happy to answer your questions, and unlike what has appeared to occur in the presidential and vice presidential debates, when you ask a question, I'll try to answer it and not go off in a different direction, and if I don't, I'd please ask the court to redirect me. So at any time you'd like to interrupt, I'm prepared to respond to any questions. I'd like to start with a review of just a few of the pertinent facts that I believe are in consideration today. This is not a million-dollar issue or a multi-million-dollar issue in terms of dollars. However, the issues involved in this occur in practically every estate settlement, regardless of the size of an estate. Personal effects are often considered priceless by beneficiaries, and even in large estates, the personal effects often have more importance and significance to the beneficiaries than do the assets that are measured by dollars. And because this applies in almost every single estate, I believe that this is an important case and that the issues raised in our appeal are important. Helen and Gordon Kruger are now deceased, husband and wife. Helen's estate was opened over 620 days after her death. Gordon's estate was opened over 240 days after his death. Gordon was the last to die. His will contained a provision that the personal effects, the tangible personal property, was to be settled up among the four children within three months of his passing. Obviously, with the petition to admit not occurring in a timely way, that 90-day period was over well before the executor was appointed. Almost one year after his death, there was a motion to sell. The executor at the time was an independent representative of the estate. It was not supervised administration under the statute by filing a motion. The discretion that the independent representative had was then waived and the lower court was then entitled to substitute the lower court's discretion in terms of acting upon the motion. In this case, the statute provides that when a child indicates that they would like an in-kind distribution of the tangible personal property, that it's inappropriate to have a sale unless it's for the proper administration of the estate or to pay bills or obligations of the estate. Claims and taxes and things like that. There has been nothing raised at the lower court to indicate that there was a need to pay items, claims or taxes. How can you have an in-kind distribution if the children don't agree on who should get what? Well, that has not been determined whether the children could agree or not agree. Because of the conduct of the executor in this case, June Brunton was never given an opportunity to see the property. An inventory wasn't provided to her of the property at the time of the motion. It had been nearly three years since her mother's passing. It had been over a year since her father's passing. We don't have a situation where she said, I want the piano. And the trial court said, no, the piano has to be sold. We don't have a situation like that. No. She did not identify any particular item of personal property. Why isn't a sale, like an auction, the best way to do it? If she wants a particular item, she can bid it in at the auction? If it were an auction among the beneficiaries, Your Honor, I believe that would have been a fair alternative to this. But exposing the items to the public means that she would not only have to outbid her siblings if they had an interest, but the entire world would be eligible to bid at the auction. I believe the purpose of the statute and the purpose of the provision in the will is to give the beneficiaries a chance to make a division of some sort among themselves in a way, and to not require a beneficiary to compete in the public domain as the highest bidder. Well, if there's a high bid, she gets to share the proceeds. Well, that relates, Your Honor, the answer to that relates to the introductory comment that I made. Some of these items could be priceless, and no dollar figure would be an appropriate consideration. Well, if they're priceless, if they have more value to her than to anybody else in the world, you don't have to worry about somebody outside the family bidding it in. Do you, or do you? Well, if the order provided for a public auction, so the entire public would be eligible to bid, and the motion and brief, there was reference made to Hummel items, for example. That's a set of figurines and collectibles. An auctioneer whose duty it is to get the highest price may decide to break up the set, or there could be somebody in the public trying to assemble a set or whatever, and it would not seem to me to be fair, based on the statute and the provisions of the will, to require June Bratton to outbid anybody in the public domain. The public, that need, would have a desire to have those items, regardless of the price, which is sometimes what happens in an auction. Well, Mr. Turner, doesn't the will provide that if they cannot agree to a division of personal property within three months, the executor shall sell said articles and apply the proceeds of sale to the residuary estate? It does, Your Honor, and that It doesn't say it's an auction amongst the four children. No, it doesn't. It says an auction or a sale. He doesn't even have to have an auction. He can load up a truck and take it to a second-hand goods store and say, what are you going to give me for all this stuff? Absolutely. But there was never an opportunity given to June Bratton to propose a distribution or to suggest an agreement on a sale. She was denied access to the property. When you say, did she select the piano or some other item of personal interest, she was relying entirely on her memory from a year having passed since her father's death, nearly three years since her mother's death, and to require the beneficiary to mentally assemble an inventory and to propose a distribution I don't think is what the statute for the will contemplates. I think that would be an unreasonable burden on a beneficiary in order to preserve her expectancy. Her interest here is simply preserving an expectancy that is most likely the result at the conclusion of other issues involved in this estate, and I believe it is fair and reasonable for her to do that. I believe that the conduct of the executor was clearly to sever her from any sentimental attachment that she might have to items of personal property that were contained in the home. And so she was completely denied access from those items. And the reason an agreement didn't occur within 90 days is because, first of all, the will was not admitted into probate until nearly 270 days after death. So the 90-day period was already over by that time, and then it was nearly a year before there was any activity by the executor regarding the personal property, and to then say this beneficiary has forfeited her rights under that provision of the will, or forfeited her interest as a beneficiary if the will is stricken, I don't believe is a reasonable interpretation of the statute or of the provisions of the will. I think it's wholly improper. I believe we would suggest to your honors that it's a breach of fiduciary duty for an estate to be administered in such fashion, and that June very responsibly attempted to preserve her expectancy. These are matters that are attended to in virtually every estate. Common sense would suggest that you don't blindly expect a beneficiary to propose agreements or to make specific selections when the beneficiary has no intention of doing so. When the beneficiary has been denied access and when an inventory or a specific description of what's there has not been provided. And for these reasons, we believe that the decision of the lower court should be reversed and that June Prunton should be given access to view the property and to propose an in-kind distribution. It would not create a harsh effect on the other beneficiaries or the executor if they have no interest in three-fourths of the personal property items. They can have a public sale of what's remaining, but first she needs to be given an opportunity to propose an agreement. An agreement is created by mutual assent. There's a meeting of the minds. And when there has not been communication here to determine whether or not there can be an agreement, neither the will nor the statute have been reasonably followed. Isn't it a little late for her to be saying that? If there were some items she wanted, shouldn't she have made that clear back in the trial court? Well, Your Honor, if she had been provided access or had been given a list of items with some specificity to them, clearly… Okay, she couldn't ask for the things she wanted because she didn't know what was there. That's your argument? No. I'm suggesting, Your Honor, that it's unfair for her to be expected to propose a reasonable distribution without having either personally inspected the premises and seen what's there or been given a list of what's there that is subject to the division. To expect her to rely on her memory a year or three years after the passing of her parents is just simply not what is contemplated by the statute and by the will. It's not contemplated by common sense, fairness, or the fulfillment of the fiduciary duty by an executor. Was there a list in Gordon's lockbox? No. But apparently when he wrote his will, he anticipated he was going to make a list of certain items of personal property that he would direct be given. I mean, that's what he said in the will. Yes, it is. But there was no such list. According to the record, there was no list. It was specifically indicated in the record that no list was discovered. Well, obviously there's disagreement and tension here between the siblings. Separate and apart from that, what reason can you point to, understanding that you take the contrary view, that would have prompted the trial court to say, when you requested to do so, that your client could not enter the premises and look, I guess, look at the personal property that remained? I have a practical answer to that, and I hate to have to suggest this, but I will anyway because I believe it's what's appropriate here. So much of the court's time at the lower level is now devoted to family law issues, dissolution of marriage. And in those types of cases, a court makes decisions like this, similar to what was made here. Those don't carry over or have application and probate. And I believe that there could have been a mixing of the two substantive areas of the law. You mean by that the kind of arguments that go on in divorce cases and the court gets sort of fed up with it and doesn't want to deal with people dividing up personal property? I'm not sure I understand what you mean. I'm suggesting, Your Honor, a little bit kinder explanation of it. In family law, it may be appropriate for the court to say decisions need to be made and actions need to occur and this matter needs to progress. So I'm going to order, based on the suggestion of one of the parties, I'm going to order this to occur or whatever. And that's done in a proper way and it's a just way. But this isn't a dissolution of marriage case. This is a probate estate and even if Robert had held a dislike for his sister, arrangements could be made for her to view the property. Time limits or whatever could have been imposed. In the response to the motion, that issue was even raised. If June was considered to be untrustworthy, arrangements could be made to allow her access in a safe way. He didn't need to personally be there. And I just think it's a breach of good faith, a breach of fiduciary duty. The most important duty in fulfilling a fiduciary duty is to provide information. And to provide nothing is a serious breach of that duty and that's what occurred in this case. Now, getting into the thinking of the lower court would be a difficult aspect to figure out. I believe it was under the standard of review here. I believe it is something that clearly can be reversed. But even if a higher standard of abuse of discretion were involved, I believe it was an abuse of discretion. I'm not suggesting worse than that. Sometimes apples and oranges in the law get mixed and the lower court can act in the best of good faith, but not be applying the correct body of law that applies to the case. And I believe that's the fairest explanation of what happened here. I see a light on here. I have stated the argument that I intended to, but I'm fully prepared to answer any more questions if you have any. I don't think so. You'll have additional time on rebuttal. Thank you. Mr. Deese. Mr. Deese, if the deceased wanted the children to have the opportunity to divide the personal property, why is it unreasonable for one of them to say, I'd like to look at the personal property or I'd like for you to show me the list of the inventory items that you think maybe ought to go to sale if we can't agree on how to divide them up? Well, may it please the court, your honors, counsel, I think our response to that would be that my co-counsel, Albert Semler, sent a letter, which is in the record, to all of the beneficiaries, and there are four beneficiaries, the executor being one of the beneficiaries, basically outlined in the letter that there was a proposal by the executor to sell the tangible personal property. More than three months expired or elapsed. There was nothing in the record to indicate that the appellant at all communicated with my co-counsel or myself, and so they had an opportunity or the appellant had an opportunity to request if there were specific humble clearings or whatever specific items of tangible personal property that would have been requested to him. There could have been a discussion about that. There was no discussion. Basically, the appellant sat on her hands. At what point in time was that letter sent? That letter was sent, your honor. It was sent on November 21st of 2011. It's at C-525. Was that within three months of the decedent's passing? No, it was not, your honor. The wills were actually filed for both Helen and Gordon on March 7th of 2011. This is slightly beyond the scope of the record because it has not really been addressed in the past, but I will identify, if it's okay with your honors, that the reason that the wills were not filed until March 7th of 2011 primarily was because there were a stack of boxes that the decedents had in their residence, and they were tendered by the executor to my co-counsel. My co-counsel took some time to go through them. At the bottom of one of the boxes he found the wills, and shortly thereafter basically decided that we needed to get these filed. There was no particular delay on behalf of the executor. The executor has not been trying to stall or delay anything. It was also found through some due diligence that some of the shares of stock, which are identified on the petition for probate, were not in the Revocable Living Trust, which caused the need for a probate to be open in both the states, and so therefore both the states were open. But nevertheless... I can understand that there are larger issues at play here, but it's pretty easy to determine from the briefs that this is not a happy family. You're correct. Okay. So, I don't know anything about the... I mean, I know what the records show. Maybe the last time the plaintiff was in the house might have been five years before a parent's death, or a year and a half before a parent's death. So, I don't know how she... I mean, I guess she could say the Hummel figures, but what else? She could. If I left... Today, if I left my house and you asked me to make a list of the things that I wanted to keep, I probably couldn't remember all the things that might have meant something to me. Even if I went room by room, I bet I would leave something out. So, how is she supposed to do that in response to that letter? Well, if we... There was no response period to the letter. She could have replied and said, we would like to set up a meeting with the attorneys and our clients and go through and discuss this. There was no response whatsoever. Is there a duty on your client's part to say, this is what we'd like to sell? I think... Just saying the contents of the house or the contents of the property, well, that could be a lot of stuff. It could be, Your Honor. With an elderly couple. But given the language in the will, the executor has a duty to try to follow the will, administer it within its four corners. Well, but does he have a duty to do an inventory of that personal property? He does have a duty to do an inventory. Has it been done? Yes, Your Honor. Subsequent to this, an inventory has been done. And also subsequent to this, to the filing of this appeal, we have also tendered nine boxes of tangible personal property to the appellant. So that inventory is now in existence? That inventory has actually been filed in the record, which is not part of this appeal. And not to go back to the dissolution or divorce analogy that Mr. Turner made, why couldn't four of them, three brothers and one sister, why can't they put their number next to the things they want? They could, Your Honor, but there was no response to our letter. We filed a motion... Well, but there wasn't any inventory when you wrote the letter. There was not inventory filed at that point, no. Well, was there inventory? I believe that they were in the process of putting it together, yes. Because if I got the letter and I had the inventory, then I might respond. And the response from the appellant could have been, Mr. Semler, Mr. Dyes, please provide us a copy of the inventory. Okay. You say there was no response, but you filed a motion for access to the residence, which you opposed. And that motion was filed on November 17th of 2011. Okay. Okay. And we did oppose that because we didn't see it at the time. That motion primarily relied upon Rule 214, which the appellant believes affords the appellant the opportunity to inspect the residence. But our view is, if you look at the record at that time, number one, there was basically a stay in place because not all parties had appeared and not all defendants had been made parties to the petitions that the appellant had filed. And so, therefore, 214, basically, that the appellant relied upon with respect to that motion to inspect or access the residence was essentially stayed and moved. One other thing, one other comment I would make with respect to that is... Go ahead. So if she filed a motion for access four days later, after the letter went out, then she would have been allowed access? I don't know the answer to that, Your Honor. We would have to go back and discuss that. I'm just sort of puzzled by how you have an estate where somebody wants to see the house, some beneficiary, and the answer is no. Well, the given... If I may make two points. One point is, given one of the reasons why the executor decided, the executor had the power under independent administration, through the court process, the executor had the power to go ahead, take all the items of tangible personal property, not say anything, you know, basically, to anyone, and sell them and follow the will, given that three months had expired. Not only had three months since date of death expired, three months since a letter was sent to him had expired, so the executor had the power to, under the will, to go ahead. But the executor chose, given the pending litigation and the contentions that were occurring between the appellant and the executor and the other beneficiaries, the executor, with counsel, decided, let's take the safe approach. Let's seek the court's approval, okay? One of counsel's arguments, or appellant's arguments in the brief, is that Section 19-1 of the Probate Act applies. We would contend that it does not apply in this case. The executor, under Section 28 of the Probate Act, basically independent administration under Section 28 of the Probate Act, gives the executor the power to do what he can following the will. One of the other sections that's cited by the appellant is Section 28-5. And if you look at 28-5, it says, if the independent representative petitions the court for instructions as to the exercise of any discretionary power. Well, we didn't petition the court regarding discretionary power. It's mandated in the will that the property be sold if there's no agreement within the three-month period. And it's three months after, if we follow the plain language of the will, it's three months after the date of death. And we're way beyond that. We even gave them three months in addition to after we sent them a letter, and there was no response. Well, how can you propose to enter into an agreement if you don't know what the will says or you don't know that you're entitled to try to come to an agreement? I mean, the 90 days had expired before the will was filed. That's correct, Your Honor. And we're not arguing that the 90-day rule necessarily applies. And one of the things we're arguing is that in addition to that, an additional three months was given to them whereby they did not respond. And rather than try to deal with the contentious party, the more prudent approach is follow the provisions identified in the will. Rather than go and sell the property without telling the appellant, bring it to the court's attention, get the court's approval of the sale, do it proper, have an auctioneer help the executor, put the auction together, have it public, allow the appellant to be able to show up. It's the most fair and reasonable approach that we could find. And one of the other points that I'd like to make is that with respect to the Rule 214 argument to inspect the residence, if the decedent, in this case the settlor's testator, signed their documents back in 2005, and we're now roughly seven years later in 2012, what are the chances that it's going to have any relevancy to be able to inspect the residence at this point in time with respect to the underlying petitions of lack of capacity and undue influence? Because lack of capacity and undue influence, which are the basis of the petitions that are on file in this proceeding, are determined as of the time the documents are signed back in 2005, not in 2012. The reason that they would like to inspect the residence is to try to, as they've identified in their brief, find various items of what illegal, illicit medicines, I don't know what all they've alleged, and the executor has not found any evidence of that. We actually believe there was a period of time between the time the first settlor passed away, that was Helen, and then the second, Gordon, whereby Gordon, we believe, cleaned out a large part of the contents of the residence, and we don't know where they're at. But we can't account for those because we weren't there during that time frame. So we're trying to do the best thing we can do, and that is be reasonable, take a fair approach, bring it to the court's attention, seek the court's approval, which the court did. In this case, we're here on appeal requesting that you would approve that. The other one or two points, I guess the other additional point that I would like to make, is that all three of the brothers signed an affidavit, and they agreed that they were okay with the sale of the property. So the only contention is with the appellant in this particular case. And then, as I mentioned, not only does Section 19-1 of the Appropriate Act, 5-19, that does not apply at all to independent administration in this particular context, but we've also identified in our brief that the doctrine of election basically bars, in this case, the in-kind distribution, which is what's requested by the appellant, because the appellant has brought a challenge or contest against the will. And moreover, we have an issue with respect to the interim clause, and there's an interim clause in this will, which basically says that you're disinherited. In this particular case, we would take the position that the appellant has filed a contest,  and received an in-kind distribution of the property. If there are no further questions, I will. When you said Gordon cleaned it out, you're referring to the decedent? Yes. Okay. I thought you were talking about one of the siblings from that. No, no. I was talking about the decedent. Okay. Thank you, Your Honor. Thank you. Rebuttal, Mr. Turner? Thank you. The first topic that was raised had to do with this letter that was sent out simultaneous with the notice that Gordon's will was going to be the topic of a petition for the appointment of an executor. And in it, it suggests that there would be an inventory prepared. Well, no inventory was prepared until after the motion to sell and after this appeal was commenced. My client certainly couldn't prepare the inventory, and my client didn't have access. Regarding the husband cleaning out the house, if the executor wasn't there during his lifetime, seeing that it was cleaned out, I don't know how the executor would know that a 90-year-old man cleaned it out. So I would say that that's certainly not a defense to what should occur in this case, which is to allow June the opportunity to examine the property at issue and to propose a in-kind distribution. As long as she is given an opportunity and exercises good faith and would make a suggestion about an undivided one-fourth. In our brief, we gave an example of siblings may decide among themselves that a dining room set is equal in value to a bedroom set, something like that. As long as it's done in good faith, I believe it would be an appropriate way to follow the will under the circumstances that have occurred in this case. Well, given the posture of the parties, isn't it pretty clear that at least the executor and perhaps the other brothers aren't going to agree to anything? I mean, in terms of the personal property. Well, that would be an unreasonable decision. If she in good faith selects genuinely 25% or less of what's there, and they say, no, we don't want you to have these things at all, that's not following the will either. Parties in all agreements are supposed to exercise good faith and fair dealing. Until she makes a proposal, I can't see any reason why we need to assume that they're going to say simply no unless it is, Your Honor, the presumption that everybody involved in this is going to take a position to treat June as rough and as harsh as humanly possible. I don't believe that the probate code allows that sort of decision making, certainly not by the executor. The executor ought to be arguing in June's favor if she makes a reasonable proposal, a reasonable agreement. The executor ought to be arguing to the brothers that this is something that should be considered and not rejected because of a feeling of animosity or bad blood. For these reasons, we believe that the lower court should be reversed. What was proposed is specifically inconsistent with the statute. It's inconsistent with the intentions expressed in the last will and testament. It's inconsistent with any notions of fair dealing and good faith, common sense, justice, fulfillment of fiduciary duty, fairness. And it's a total disregard for the priceless sentimental attachment that almost all families have in larger states and smaller states to items of property contained in the marital home of the parents. I'd be pleased to answer any more questions. Thank you for your time today. Thank you. We'll be taking our advisement and we'll stand in recess until 1 o'clock. Thank you.